UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| Armen Dallakian, ) | | |
|     Plaintiff, ) | | |
| ) | | **CIVIL ACTION** |
| v. ) | | **NO. 13-11863-TSH** |
| ) | | |
| IPG Photonics Corporation, ) | | |
|     Defendant, ) | | |
| ) | | |

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS (Docket No. 22)
### July 7, 2014

**HILLMAN, D.J.**

### Background

Plaintiff, Armen Dallakian ("Dallakian") has filed suit against IPG Photonics Corporation ("IPG") for: (1) correction of the name of the inventors on U.S. Patent No. 8,014,641 (" '641 Patent") pursuant to 35 U.S.C. §§ 115 and 116; (2) misappropriation of trade secrets under Massachusetts common law; (3) misappropriation of trade secrets under Mass.Gen.L ch. 93 §§ 42 and 42A: and (4) violation of the Massachusetts Consumer Protection Act, Mass.Gen.L. ch. 93A §§ 2 and 11 (Chapter 93A) with respect to certain technology developed, patented and brought to market by IPG after Dallakian terminated his consulting relationship with IPG.

This Memorandum and Order addresses Defendant's Motion to Dismiss Counts II-IV of the Complaint pursuant to Fed.R.Civ.P. 12(b)(6)((Docket No. 22). For the reasons, set forth below, that motion is denied.

## Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937 (2009). Plausibility "is not akin to a probability requirement, but [requires] more than a sheer possibility...." *Id.* Thus, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.*

In this case, IPG seeks to dismiss Counts II-IV on the grounds that they are barred by the statute of limitations.

> When the allegations in a complaint show that the passage of time between the events giving rise to the claim and the commencement of the action exceeds the applicable limitations period, a district court should grant a 12(b)(6) motion by the defense if the complaint (and any other properly considered documents) 'fails to "sketch a factual predicate" that would' provide a basis for tolling the statute of limitations.
>
> In making such an assessment under Rule 12(b)(6), a district court engages in no fact finding. Rather, it presumes that the facts are as properly alleged by plaintiff[] and/or reflected in other properly considered records, with reasonable inferences drawn in plaintiff['s] favor.

*Abdallah v. Bain Capital LLC*, 13-2008, 2014 WL 2462555, *3 (1st Cir. June 3, 2014)(internal citations and citation to quoted case omitted).

Under Massachusetts law, the statute of limitations period begins to run from the date "an event or events ... that are reasonably likely to have put the plaintiff on notice that he has been harmed." *Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.,* 412 F.3d 215, 241 (1st Cir.2005). Under this so-called "discovery rule," the limitations period begins to run when "events occur or facts surface which would cause a reasonably prudent person to become aware that she or he had been harmed." *Felton v. Labor Relations Com'n,* 33 Mass.App.Ct. 926, 598 N.E.2d 687, 689 (1992); *see also Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 241 (1st Cir. 2005). "A plaintiff is considered to be on

'inquiry notice' when the first event occurs that would prompt a reasonable person to inquire into a possible injury at the hands of the defendant." *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183 (1st Cir. 2006). Finally, it is not necessary that the plaintiff know the full extent of his injuries, so long the event(s) or facts were sufficient to alert the plaintiff he had been harmed. *Stark v. Advanced Magnetics, Inc.*, 50 Mass.App.Ct. 226, 233 (2000).

"[T]he question when a plaintiff knew or should have known of his cause of action is one of fact which in most instances will be decided by the trier of fact." *Riley v. Presnell,* 409 Mass. 239, 240, 565 N.E.2d 780 (1991). However, where "the facts are undisputed, the issue may be decided as a matter of law." *Khatchatourian v. Encompass Ins. Co. of Mass.,* 78 Mass.App.Ct. 53, 57, 935 N.E.2d 777 (2010). Because the statute of limitations is an affirmative defense IPG, bears the initial burden of proof. *Orbusneich Medical Co. Ltd. v. Boston Scientific Corp.*, Civ. Act. No. 09-10962-RGS, 2011 WL 1086015, at *2 (D.Mass. Mar. 21, 2011).

## Discussion

IPG seeks to dismiss Counts II-IV of the Complaint on the grounds that they are barred by the applicable statute of limitations. In Massachusetts, tort actions are governed by a three year statute of limitations and claims arising under Chapter 93A have a statute of limitations of four years. *See* Mass. Gen. Laws ch. 260, §§ 2A, 5A; *see also Stark v. Advanced Magnetics, Inc.*, 50 Mass.App.Ct. 226, 232 (2000)(misappropriation of trade secrets governed by three year statute of limitations). Therefore, Dallakian's claims for misappropriation of trade secrets (Counts II and III) must not have accrued prior to August 5, 2010 and his Chapter 93A must not have accrued prior to August 5, 2009, unless Dallakian can establish that such claims are subject to equitable tolling[1].

---

[1] Under Massachusetts law, the statute of limitations may be tolled where: " ' "the wrongdoer ... concealed the existence of a cause of action through some affirmative act done with intent to deceive," ' " but " '

3

*Factual Allegations In Complaint Relevant To The Statute of Limitations*

Dallakian is a recognized expert in the field of photonics, the science and technology concerned with the generation, transmission, and sensing of photons. Photons are elementary particles of light. Laser equipment relies on optical fiber to transmit light energy. *Complaint*, at ¶2. IPG manufactures high-performance fiber lasers and amplifiers for use in materials processing, advanced technologies, telecommunications and medical applications.

An optical fiber is a flexible and transparent fiber made of glass (silica) or plastic that is slightly thicker than a human hair. It functions as a waveguide, or "light pipe," to transmit light between the two ends of the fiber. The field of applied science and engineering concerned with the design and application of optical fibers is known as fiber optics. Optical fibers are widely used in fiber-optic communications, which permits transmission of information over longer distances and at higher bandwidths (data rates) than other forms of communication, and in lasers, and other high technoloAgy applications. Fibers are commonly used to deliver high power output from a laser to a remote work piece. *Id..*, at ¶7. A fiber optic coupler is a device used in optical fiber systems to optically connect one or more input fibers to one or several output fibers. A fiber optic switch can generally be described as a device having several fiber couplers sharing the same input fiber, and a beam switching mechanism to optically connect one pair of input and output fibers at a time. *Id.*, at ¶9. A coupler's accuracy, mechanical and thermal stability, size, simplicity, and operator-friendliness define its performance, cost and value.

Dallakian is the inventor of a technique which allows for simple and effective alignment of light as it passes from one fiber optic cable to another via a coupler switch (the "Fiber

---

"[t]he statute of limitations ... is not tolled if the plaintiff has actual knowledge of the facts giving rise to his cause of action." ' " The doctrine of equitable tolling also provides no relief to a plaintiff who knows of facts sufficient to bring the cause of action. Indeed, equitable tolling only applies " 'if a plaintiff exercising reasonable diligence could not have discovered information essential to the suit.' " *Abdallah* , 2014 WL 2462555 at * 3 (internal citations and citations to quoted cases omitted).

Coupling Invention"). *Id.,* at ¶ 1. Dallakian conceived and reduced to practice prototypes of his Fiber Coupling Invention in 2001. Since testing the prototypes in 2001, he has sought opportunities to market/license his invention, including to IPG. In all such instances, Dallakian was careful not to disclose his Fiber Coupling Invention to the general public, or to IPG, or to any third-party, except on a "need to know" basis and under conditions where those to whom disclosures were being made were under obligations to maintain confidentiality. *Id.*, at ¶18. Dallakian's innovative technique is both extremely inexpensive and highly accurate. *Id.,* at ¶¶12-13. He described two embodiments of his invention in writing on July 7, 2006 and it was witnessed on July 14, 2006, before he began his relationship with IPG. *Id.*, at ¶15. In other words, he conceived the Fiber Coupling Invention prior to the parties entering into a consulting arrangement.

In late 2006 and early 2007, the parties discussed possibilities for collaboration with Dallakian providing designs for opto-mechanical and optical components and subassemblies for IPG. IPG proposed that Dallakian work as an employee. However, he refused and instead agreed only to consult for IPG as an independent contractor. Consistent with this relationship, IPG paid Dallakian consulting fees without deduction of payroll taxes. On several occasions, IPG proposed that Dallakian assign all right, title and interest to certain of his inventions to it. However, Dallakian refused and did not agree to transfer any ownership interest in any of his inventions to IPG, including the Fiber Coupling Invention and its derivatives. *Id.*, at ¶¶ 21-23.

On April 1, 2007, Dallakian commenced his relationship with IPG and moved from Pennsylvania to Massachusetts. Within the first couple of months, Dallakian successfully completed a couple of projects. Thereafter, he was shown a prototype of IPG's high-power fiber coupler and was asked for assistance in refining the design. Dallakian determined that

modification of IPG's design would be futile and that his own Fiber Coupling Invention could be successfully used in a coupler in order to substantially reduce its bulk and reduce its cost. *Id.*, at ¶¶ 26-27. He successfully built and tested a prototype using his Fiber Coupling Invention; the prototype was tested at IPG's facilities in Germany and the United States. *Id.*, at ¶28. IPG's founder, who is the Chief Executive Officer, and a number of IPG research and development engineers attended a demonstration of the prototype. Shortly thereafter, IPG's patent attorney approached Dallakian and asked him to file a patent application for his Fiber Coupling Invention and its derivative forms. He refused. Thereafter, he built five coupler prototypes for IPG for use in confidential field testing. *Id.*, at ¶¶ 29-31.

Dallakian severed his consulting arrangement with IPG in late February 2008 due to health reasons and working conditions. At that time, he offered to license his Fiber Coupling Invention to IPG. He then sent IPG a letter in February 2008 (the "February 2008 Notice") in which he advised IPG that:

> the beam switch (partially) and the beam coupler (completely) are based on my inventions created years before this assignment. I retain all the rights in that intellectual property and would be glad to license it to you. Those inventions will be available for a while, then they will be licensed to the interested companies. So, please be in touch with me to avoid very likely legal complications should you decide to bring to market the mentioned products.

*Id.*, at ¶31.

On March 7, 2008, Dallakian filed a provisional patent application (61/068,402) titled "Simple Method And Apparatus For High-Resolution Positioning of Optical Components" ("Dallakian Patent Application") in which he described the two embodiments *Id.*, at ¶16. His invention was not used in the industry until after he had disclosed it to IPG. *Id.*, at ¶¶14-15.

On December 31, 2008, IPG filed a U.S. Patent Application, No. 12/319,070, entitled "Beam Coupler," naming inventors Yuri Grapov, William D. Jones, and Vladlen Ivshin. The patent application was made public on July 1, 2010 and the '641 Patent later issued. IPG's patent lawyer was one of the prosecuting attorneys on the application. Three of IPG's employees were named as inventors of the '641 Patent. Dallakian was not credited even though, in addition to his contribution to all aspects of the patent, Claim 8 of the '641 Patent is directly derived from his Fiber Coupling Invention.

Also on December 31, 2008, IPG filed U.S. Patent Application No. 12/317,068, entitled "Apparatus for Selectively Distributing Energy for a Laser Beam," naming inventors Yuri Grapov, William D. Jones, and Michael DiGiantommaso. The application was made public on July 1, 2010 and the patent issued as U.S. Patent No. 8,320,426; this patent was built upon the alleged essential trade secret discovered by Dallakian. On March 3, 2009, Defendant filed a third application, U.S. Patent Application No. 12/396,536, a continuation-in-part application, entitled "Sealed Beam Coupler For An Isolated Environment," naming inventors Yuri Grapov, William D. Jones, and Michael M. DiGiantommaso that was issued as U.S. Patent No. 7,794,159, which was also made public on July 1, 2010. Defendant also filed a U.S. Patent Application No. 12/317,997, entitled "Mirror Positioning Apparatus For Use In Beam Switching," naming inventors Yuri Grapov, William D. Jones, and Michael M. DiGiantommaso issued as U.S. Patent No. 7,982,935, made public on July 1, 2010, which built upon the alleged trade secret discovered by Dallakian. Each of these applications included disclosures of aspects of Dallakian's Fiber Coupling Invention. Finally, on February 16, 2011, IPG filed an international patent application PCT/US2011/025012, entitled "Beam Coupler Alignment System and Method," naming inventors William Jones, Yuri Grapov, and Michael DiGiantommaso, published as

WO2012/112146, which builds upon the essential trade secret provided by Dallakian. *Id.,* at ¶¶36-37.

Until September 5, 2011, Dallakian was not aware that IPG was seeking these patents or using his Fiber Coupling Invention. On that day, he discovered the '641 Patent application in a search of the U.S. Patent and Trade Office ("PTO") web site. Thereafter, he learned that IPG had incorporated his Fiber Coupling Invention into its couplers and switches. *Id.,* at ¶39. On August 5, 2013, Dallakian filed this action. From 2008 to the present, IPG has sold thousands of couplers and hundreds of switches based on his Fiber Coupling Invention. *Id.*, at ¶41.

## Discussion

IPG asserts that the factual allegations in the Complaint establish that Dallakian actually knew, or at least should have known of the alleged harm at the time that he severed his relationship with IPG in early 2008. More specifically, IPG contends that Dallakian knew when he left IPG that it was trying to design, build and commercialize a high-powered coupler and that prior to the severing of his consulting relationship, IPG had built and successfully tested multiple couple prototypes which integrated his Fiber Coupling Invention. He was also aware that IPG was preparing a patent application covering the prototype and expressly refused to assist IPG's in-house patent attorney in preparing the application because the Fiber Coupling Invention was his own confidential property. Shortly after severing his relationship with IPG, he sent it a "demand letter," in February 2008 (the February 2008 Notice), restating his ownership of the Fiber Coupling Invention and threatening "legal complications." Furthermore, within a few weeks of severing his relationship with IPG, on March 7, 2008, he filed his own patent application regarding the Fiber Coupling Invention. IPG argues that given these operative facts, Dallakian's claims for trade secrets misappropriation and violation of Chapter 93A accrued long

8

before August 5, 2009 and therefore, are barred. In the alternative, IPG argues that Dallakian at least had constructive knowledge of his claims as of July 1, 2010 when the patent application for the '641 Patent was published on the PTO's website and therefore, his misappropriation of trade secret claims are time barred.

Dallakian, on the other hand, asserts that he did not learn that IPG had misappropriated his invention until September 5, 2011 and that the facts alleged in the Complaint do not support a contrary finding. He further argues that the publication of IPG's patent application in July 2010 did not put him on constructive notice that he had been injured because under Massachusetts law, he would not have a duty to search the PTO site to investigate whether anyone, including IPG, had stolen his idea.

This is a close call, particularly with respect to the misappropriation of trade secret claims (Counts II and III), which carry a three year statute of limitations. I do find that based on the factual assertions in the Complaint, it is clear that Dallakian was on notice, either actual or constructive, well prior to September of 2011. At the same time, for the reasons set forth below, I cannot determine, as a matter of law, that Dallakian's misappropriation of trade secret and Chapter 93A claims are time barred.

On the face of the Complaint, Dallakian was injured in 2008 when IPG allegedly began selling products (couplers and switches) which incorporated his Fiber Coupling Invention. I agree with the IPG that the operative facts suggest that Dallakian, if he did not have actual knowledge, at the very least had constructive knowledge that IPG may have misappropriated his invention as early as 2008 and by July 2010 at the latest. Those facts are as follows: (1) while consulting for IPG, Dallakian was aware that IPG wanted to design and build its own couplers and switches; (2) before leaving IPG, he helped IPG refine its design for a high powered coupler

9

and built a prototype using his alleged trade secret; that prototype was successfully tested by IPG at both its United States and German facilities; (3) IPG's in-house patent attorney approached him about filing a patent application for his Fiber Coupling Invention and its derivative forms, (4) on March 7, 2008, shortly after terminating his consulting relationship with IPG, Dallakian filed his own application for a patent covering his Fiber Coupling Invention, (5) after terminating his consulting arrangement with IPG, Dallakian sent IPG the February 2008 Notice, in which he advised IPG that the beam switch and beam coupler developed while he was consulting with IPG were both based on his inventions and that "legal complications" would arise should IPG bring those products to market without obtaining an appropriate license, (6) IPG allegedly began selling the couplers and switches incorporating Dallakian's technology in 2008, and (7) on July 1, 2010, the application for the '641 Patent was made public.

Relying primarily on *Epstein*, IPG argues that Dallakian was on notice of potential harm at the time that he sent the February 2008 Notice, which IPG characterizes as a demand letter. In *Epstein*, plaintiff sent a letter to the defendant/manufacturer stating that it had been brought to his attention that the defendant's product, which incorporated his trade secret, was still available for sale despite the fact that plaintiff had ceased manufacturing and supplying it to the defendant over a year earlier  The First Circuit found that at the time he sent the letter, plaintiff "had reason to believe that [defendant] was making unauthorized use of his intellectual property." *Epstein*, 460 F.3d at 188. Therefore, there was no doubt that plaintiff had cause for concern and "a reasonable person would have inquired into the issue," and therefore, plaintiff was on inquiry notice. *Id.*

In this case, based on the facts alleged in the Complaint, all that is known is that at the time that he left IPG, Dallakian was aware that IPG was attempting to design build, and market

its own fiber optic coupler and that he had built multiple working prototypes for IPG during his tenure which incorporated his Fiber Coupling Invention. IPG's reliance on the February 2008 Notice is misplaced as this case is easily distinguishable from *Epstein.* The excerpt of the February 2008 Notice included in the record served to warn IPG that if it intended to utilize his invention in its product, it would need to obtain a license— unlike the letter to the alleged wrongdoer in *Epstein,* the February 2008 Notice, in and of itself, does not establish that Dallakian had reason to believe *at that time* IPG was making unauthorized use of his invention, or that it intended to do so. However, at some point along the time continuum, additional facts of which Dallakian was aware, or reasonably should have been aware, would have caused a reasonably prudent person to investigate whether IPG had misappropriated his confidential trade secrets.[2] However, based on the allegations in the four corners of the Complaint, I cannot find, as a matter of law, that Dallakian knew or should have known of IPG's alleged wrongful conduct in 2008 or 2009.

IPG next argues that Dallakian was on constructive notice no later than July 1, 2010 when IPG's application for the '641 Patent was published on the PTO website (according to Dallakian, the '641 Patent derived directly from his Fiber Coupling Invention). IPG argues that the fact that Dallakian had filed his own patent application, that he knew IPG was interested in marketing a high-powered coupler and suspected that IPG would try to utilize his invention combined with the fact that the '641 Patent application was readily available on PTO's website after July 1, 2010 imputed constructive knowledge to him of the potential misappropriation of

---

[2] For example, in March 2008, Dallakian filed his own application for a patent. Also in 2008, IPG allegedly filed a patent application for a fiber optic coupler and started to manufacture and sell products which Dallakian alleges incorporated his invention.

his trade secrets. Considering all of these facts, IPG appears to have the better of this argument[3]. Nevertheless, the Court is mindful that the issue has been raised on the context of a motion to dismiss. Given that I find that the question of what Dallakian knew or should have known in 2008-09 requires are more developed record, I am going to reserve ruling on this issue. [4]

IPG's motion raises a significant question as to whether some or all of Dallakian's state law claims are time barred. While that issue cannot be decided on this record, I find that in the interest of judicial economy and efficiency, the question of whether such claims are time barred should be addressed sooner rather than later. Therefore, the Court will schedule a status conference at which the parties should be prepared to address what limited discovery is necessary to flesh out the record with regard to this issue. Thereafter, the Court will allow the parties the opportunity to file motions for partial summary judgment on the question of whether Counts II-IV are barred by the statue of limitations.

## **Conclusion**

For the foregoing reasons, IPG's Motion to Dismiss (Docket No. 22) is ***denied***. A conference shall be scheduled forthwith to set a schedule for addressing the statute of limitations issue by way of motion(s) for summary judgment.

/s/ Timothy S. Hillman
TIMOTHY S. HILLMAN
UNITED STATES DISTRICT JUDGE

---

[3] While the publication of the application itself may not deemed to be constructive notice, taken in conjunction with other facts known or reasonably available to Dallakian, it difficult to fathom how a reasonably prudent person would not be deemed to be on inquiry notice by July 1, 2010, at the latest. *See e.g., Wang v. Palo Alto Networks, Inc.*, No. C 121-05579 WHA, 2014 WL 1410346 (N.D.Cal. Apr. 11, 2014) (inventor actively practicing in field and prosecuting his own patent application must be deemed to be on constructive notice of published patent applications in same field).

[4] As Dallakian is likely to raise the argument again, I will note that I agree with IPG that his continuing tort theory is unavailing as the alleged wrong in this case arises from one alleged event: IPG's wrongful misappropriation of his confidential trade secrets, not a continuing series of wrongful events. *See Maslauskas v. United States*, 583 F.Supp. 349, 351 (D.Mass. 1984)(continuing tort doctrine requires that tortious conduct continue up though some time within limitations period and that there be "continual unlawful acts, not [merely] continuing ill effects from an original tort.").